**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| Alden Walther, Jr., | ) | |
| Plaintiff, | ) | C.A. No. 8273-MA |
| | ) | |
| v. | ) | |
| | ) | |
| ITT Educational Services, Inc., | ) | |
| Defendants | ) | |

**MASTER'S REPORT**

Date Submitted: October 7, 2014
Draft Report: July 28, 2014
Final Report: February 10, 2015

Alden Walther, Jr., is a shareholder of ITT Educational Services, Inc. ("ITT"), a for-profit provider of postsecondary degree programs throughout the United States. Walther has made a demand for books and records from ITT under Section 220 of the Delaware General Corporation Law ("DGCL"), seeking to investigate, *inter alia*, possible mismanagement, waste, and breaches of fiduciary duty at ITT - specifically, ITT's compliance with federal Title IV eligibility requirements relating to ITT's primary source of revenue: federal Title IV student loans.[1] As support for his suspicions, Walther cites ITT's public disclosures regarding its student cohort default rates for the years 2009 through 2012, and a Majority Committee Staff Report ("Staff Report") issued by the United States

---

[1] Federal student loans are provided for by Title IV of the Higher Education Act of 1965 ("HEA").

Senate Health, Education, Labor and Pensions Committee ("Senate HELP Committee") in July 2012, which stated that ITT had only recently begun to focus on bringing down its three-year default rate. Walther claims that his evidence is sufficient as a matter of law to support a Section 220 demand, and has moved for summary judgment under Court of Chancery Rule 56. ITT, in turn, claims that Walther's evidence is insufficient as a matter of law and has filed a cross-motion for summary judgment. For the reasons below, I find that Walther's evidence is sufficient to support his demand to investigate a potential mismanagement claim and, therefore, I recommend in this draft report that the Court grant Walther's motion for summary judgment as to four of the five categories of requested books and records.

Factual Background[2]

ITT offers diploma, associate, bachelor, and master degree programs in various fields of study throughout the United States. It operates two main brands: Daniel Webster College and the ITT Technical Institutes. The Institutes account for 99 percent of ITT's students, and the majority of ITT's revenues come from Title IV Federal student aid programs. To be eligible to receive Title IV funds, ITT

---

[2] The factual background is taken directly from the pleadings and the parties' affidavits since neither party disputes any issue of material fact in this case.

must fulfill certain eligibility requirements, one of which is based on student loan default rates.

From 1990 to 2011, student loan default rates were calculated by the United States Department of Education ("Department of Education" or "ED") using a cohort default rate ("CDR") measured over a two-year period. A two-year CDR is the rate at which students who are scheduled to begin repayment on their loans in year one have defaulted on their loans by the end of year two. From 1994 to 2011, if an institution was determined to have a two-year CDR of 25 percent or greater for three consecutive years, it would be ineligible to receive Title IV funds for three years beginning with the year in which the determination was made. An institution with a two-year CDR of 25 percent or more in any two of the three most recent years would be placed on provisional Title IV status.

In August 2008, the HEA was amended and changes were made to the CDR requirements for Title IV eligibility. Beginning in 2009, CDRs were measured over three years and the eligibility threshold was raised to 30 percent from 25 percent.[3] The first official three-year CDRs were scheduled for release on September 24, 2012. Beginning in October 2009, the Department of Education

---

[3] Beginning in 2014, an institution can be placed on provisional certification status if the institution's official three-year CDR is 30 percent or greater for at least two of the three most recent federal fiscal years. Affidavit of Matthew A. Houston in Support of Plaintiff's Motion for Summary Judgment, Ex. 3 at p. 34.

released trial three-year CDRs for each year starting with the 2005 cohort. However, the first cohort to be monitored for the additional year consisted of borrowers who entered repayment between October 1, 2008 and September 30, 2009.[4] Thus, an institution's 2009 three-year CDR would reflect the percentage of borrowers in the 2009 cohort who defaulted on their student loans on or before September 30, 2011.

On February 18, 2009, ITT filed its annual report for 2008 on Form 10-K with the Securities and Exchange Commission ("SEC"), disclosing that it derived approximately 73 percent of its revenues from federal student financial aid programs under Title IV, and disclosing the 2008 changes to the calculation of student default rates and the new threshold at which an institution could lose its Title IV eligibility. On October 28, 2009, the Department of Education promulgated regulations dealing with three-year CDRs, and on December 7, 2009, it released illustrative trial three-year CDRs to all institutions.

On August 6, 2010, ITT filed a Form 8-K with the SEC disclosing that the company had received a request for information and documents from the Senate HELP Committee. On October 22, 2010, ITT filed a Form 10-Q with its quarterly results for the third quarter of 2010, disclosing that the Senate HELP Committee was conducting hearings in connection with the for-profit education industry.

---

[4] The federal fiscal year ("FFY") is October 1 through September 30. *Id.* at pp. 28, 32.

On February 17, 2012, ITT common stock closed at $75.52, its high for 2012. On February 24, 2012, ITT filed its annual report for 2011, disclosing that the average of its three institutions' two-year CDRs had risen from 11.5 percent in 2007 to 22.3 percent in 2009.[5] In addition, the annual report disclosed:

> We believe that the increase in the official Two-Year CDR average for FFY 2009 compared to the official Two-Year CDR average for FFYs 2008 and 2007 was primarily due to the servicing on the FFEL program loans that were purchased by the ED from the lenders (the "Purchased Loans"). The Purchased Loans were initially serviced by the FFEL program lenders that made those loans, until the Purchased Loans were sold to the ED. Upon receipt of the Purchased Loans, the ED transferred the servicing of those loans to the servicer of the FDL program loans. Shortly thereafter, the ED replaced the servicer of the FDL program loans with four different servicers, and servicing of the Purchased Loans was distributed among the new servicers of the FDL program loans. We believe that the changes in the servicers of the Purchased Loans had a negative impact on the servicing of those loans, which could have resulted in a higher Two-Year CDR average with respect to those loans. Our institutions' Two-Year CDR average for FFY 2009 with respect to the FFEL program loans that were not sold by the FFEL program lenders to the ED (the "Retained Loans") was approximately the same as our institutions' Two-Year CDR average for FFY 2008. We believe that this is primarily due to the absence of any disruption in the servicing of the Retained Loans.
>
> We appealed the ITT Technical Institute institutions' official Two-Year CDRs for FFY 2009 on the basis that the Purchased Loans were improperly serviced. We have not yet received the ED's determination with respect to our appeals, but

---

[5] *Id.* at p.32. As of December 31, 2011, ITT had three institutions, as defined by the Department of Education - two ITT Technical Institute main campuses and one DWC ("Daniel Webster College") main campus. *Id.* at pp. 16-17.

we believe that the average of our ITT Technical Institute institutions' official Two-Year CDRs for FFY 2009 should be lowered by the ED to between 13.8% to 19.0%, based on the loan servicing information on the Purchased Loans included in the Two-Year CDRs for FFY 2009 that we obtained from the servicers of those loans. Based on this same information, we believe that the Purchased Loans included in the Two-Year CDRs for FFYs 2010, 2011, and possibly, 2012 may also have been improperly serviced. As a result, we intend to appeal the ITT Technical Institute institutions' official Two-Year CDRs for FFYs 201, 2011 and, possibly, 2012 on the basis that the Purchased Loans were improperly serviced.

Beginning with the official Three-Year CDRs for FFY 2009 (which we believe will be published by the ED in September 2012), the cohort default rate for three consecutive FFYs that trigger loss of eligibility to participate in FDL and Pell programs increases from 25% to 30%. We believe that our institutions' Three-Year CDRs will likely be higher than our institutions' Two-Year CDRs, because of longer repayment and default histories, among other factors. We believe that the ITT Technical Institutes' Three-Year CDRs will exceed 30% for FFY 2009 and could exceed 30% for FFY 2010, in each case primarily due to the servicing on the Purchased Loans, as discussed above.

Since the same Purchased Loans are included in both the Two- and Three-Year CDRs for FFY 2009, we intend to appeal the ITT Technical Institute institutions' official Three-Year CDRs for FFY 2009 on the basis that those Purchased Loans were improperly serviced, unless the ED removes the improperly serviced Purchased Loans from the calculation of those rates as a result of our appeal of the ITT Technical Institute institutions' official Two-Year CDRs for FFY 2009 discussed above. Similarly, and for the same reason that we intend to appeal the Two-Year CDRs for FFYs 2010, 2011 and, possibly, 2012, as discussed above, we intend to appeal the ITT

Technical Institute institutions' Three-Year CDRs for FFYs 2010, 2011 and, possibly, 2012.[6]

On March 13, 2012, ITT's common stock closed at $63.57 per share. On April 26, 2012, ITT filed a Form 10-Q with the SEC, disclosing its results for the first quarter of 2012, and the following statement:

> Beginning with the official Three-Year CDRs for FFY 2009 (which we believe will be published by the ED in September 2012), the cohort default rate for three consecutive FFYs that triggers loss of eligibility to participate in FDL and Pell programs increases from 25% to 30%. We believe that our institutions' Three-Year CDRs will likely be higher than our institutions' Two-Year CDRs, because of longer repayment and default histories, among other factors. ***The ITT Technical Institute institutions' preliminary average Three-Year CDR for FFY 2009 was 34.2%, and we believe that the ITT Technical Institute institutions' Three-Year CDRs could exceed 30% for FFY 2010, in each case primarily due to the servicing on the Purchased Loans,*** as discussed above.[7]

On July 29, 2012, the Senate HELP Committee released the Staff Report entitled "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success."[8] ITT was one of 30 companies examined by the Senate HELP Committee. The Staff Report included the following statements about ITT:

> While the number of students leaving ITT with no degree is lower than some, the number of students defaulting on student loans is high. … The 3-year default rate across all 30 companies examined

---

[6] *Id.* at pp. 32-34.
[7] Affidavit of Matthew M. Houston, Ex. 4 at p. 31 (emphasis added).
[8] Affidavit of Matthew M. Houston, Ex. 5.

increased each fiscal year between 2005 and 2008, from 17.1 percent to 22.6 percent. This change represents a 32.6 percent increase over 4 years. ITT's default rate has similarly increased, growing from 21.1 percent for students entering repayment in 2005 to 26.3 percent for students entering repayment in 2009. ITT's most recent default rate is the sixth highest rate of loan default amongst the 30 schools. The company expects its 2009 draft 3-year cohort default rate to be approximately 34 percent.

It is likely that the reported default rates significantly undercount the number of students who ultimately face default, because of companies' efforts to place students in deferments and forbearances. Helping get delinquent students into repayment, deferment, or forbearance prior to default is encouraged by the Department of Education. However, for many students forbearance and deferment serve only to delay default beyond the 3-year measurement period the Department of Education used to track defaults.

Default management is primarily accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances. Default management contractors are paid to counsel students into repayment options that ensure that students default outside the 2-year, soon to be 3-year, statutory window, in which the Department of Education monitors defaults.

***ITT has only recently begun to focus these efforts on bringing down their 3-year default rate.*** When discussing as to why the 3-year default rate was higher than the 2-year, ITT CFO Daniel Fitzpatrick stated:

> *I think that you do know that when we talk about adding that third year into the calculation, really that third year was not really worked at all, in the way the first two years are worked and so it is really hard to indicate what type of impact we can have there. We know that when we provided*

> ***default management services there, we are able to mitigate losses.***[9]

At the close of markets on July 20, 2012, the first trading day after the release of the Senate Report, ITT common stock closed at $39.99 per share. On October 11, 2012, Walther served ITT with a written demand under oath to inspect ITT's books and records for the following purposes:

> (1) to investigate corporate mismanagement, waste, or wrongdoing, including but not limited to, to determine whether the Company's officers and directors have properly discharged their fiduciary duties to the Company and its stockholders; (2) to obtain information to determine whether or not the Company's officers and directors are independent and disinterested, and whether they have acted in good faith; and (3) to value the stock held by the Record Holder.[10]

Walther requested inspection of the following books and records during the time period of January 1, 2008 through October 9, 2012 ("Relevant Period"):

(1) All books and records during the Relevant Period constituting, reflecting, or related to all Board of Director or committee meeting minutes concerning the Company's processes for compliance with the Title IV Cohort Default Rate eligibility requirements;

(2) All books and records during the Relevant Period constituting, reflecting, or related to all Board of Director or committee meeting minutes concerning the underwriting issues related to the Company's high Cohort Default Rates;

(3) All books and records during the Relevant Period constituting, reflecting, or related to all Board of Director or committee meeting

---

[9] *Id.* at pp. 532-534 (citing ITT Educational Services, 2009, Q4 Earnings Conference Call with Investors) (previous citations omitted) (emphasis added).

[10] Affidavit of Matthew M. Houston, Ex. 7 at p. 2.

minutes concerning the appeals made to the U.S. Department of Education regarding student Cohort Default Rates;

(4) All books and records during the Relevant Period constituting, reflecting, or relating to all Board of Director or committee meeting minutes concerning the Company's projections of student Cohort Default rates for the 2010, 2011, and 2012 cohorts; and

(5) All books and records during the Relevant Period constituting, reflecting, or related to all Board of Director or committee meeting minutes concerning steps the Company has taken to avoid penalties under Title IV related to excessive Cohort Default Rates.[11]

On November 29, 2012, ITT rejected Walther's demand as mere curiosity about management, unrelated to any stated or proper purpose.[12]  On February 1, 2013, when Walther filed this complaint, ITT's common stock closed at $16.28 per share.

## Analysis

It is undisputed that Walther is a shareholder of ITT and has complied with the statutory demand requirements of 8 *Del. C.* § 220.  In order to obtain the relief he seeks under Section 220, Walther must demonstrate a proper purpose by the

---

[11] *Id.* at pp. 1-2.
[12] Affidavit of Matthew M. Houston, Ex. 10.

preponderance of the evidence.[13]   A proper purpose is one which is "reasonably related" to Walther's "interest as a stockholder."[14]

ITT contends that Walther has not demonstrated that the purposes stated in his demand are his actual purposes and has not demonstrated a credible basis from which the Court could infer mismanagement or to support Walther's request to investigate the Board's independence and disinterestedness.  ITT also contends that Walther has failed to prove that publicly available information is insufficient to value his shares of publicly traded stock, and that the scope of Walther's books and records demand is overbroad.

The investigation of mismanagement, waste or wrongdoing is a proper purpose for a Section 220 books and record inspection.[15]   However, the "mere statement of a purpose to investigate possible mismanagement without more, will not entitle a shareholder to broad 220 inspection relief.  There must be some evidence of possible mismanagement that would warrant further investigation of

---

[13] *Caspian Select Credit Master Fund Ltd. v. Key Plastics Corp.*, 2014 WL 686308, at *3 (Del. Ch. Feb. 24, 2014) (citing *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006)).
[14] 8 *Del. C.* § 220(b).
[15] *Security First Corp. v. U.S. Die Casting and Development Co.*, 687 A.2d 563, 567 (Del. 1997) (citing *Thomas & Betts Corp. v. Leviton Manufacturing Co.*, 681 A.2d 1026, 1031 (Del. 1996)).

the matter."[16]  A shareholder does not have to prove actual mismanagement has occurred, but he must make "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[17]  The "'credible basis' standard 'sets the lowest possible burden of proof;'" anything less would permit inspection based on a mere suspicion of wrongdoing.[18]

Walther has presented the following evidence supporting a credible basis for his concern about ITT's possible failure to comply with the new three-year cohort default rating system in order to retain its eligibility to receive Title IV funding: (1) ITT's 10-Q Form for the first quarter of 2012 disclosing that the ITT Technical Institute institutions' preliminary average three-year CDR for FFY 2009 was 34.2 percent and that the ITT Technical Institute institutions' preliminary average three-year CDR for FFY 2010 could also exceed the 30 percent threshold; and (2) the 2012 Staff Report, which stated that ITT had only recently begun to focus its efforts on bringing down the three-year default rate.

ITT, however, argues that none of these assertions constitute an affirmative evidentiary showing from which the Court could infer corporate mismanagement.

---

[16] *Helmsman Mgmt. Servs. Inc. v. A & S Consults., Inc.*, 525 A.2d 160, 165-66 (Del. Ch. 1987), quoted in *Louisiana Municipal Police Employees' Retirement System v. Lennar Corp.*, 2012 WL 4760881, at *3 (Del. Ch. Oct. 5, 2012).

[17] *Sec. First Corp.*, 687 A.2d at 568.

[18] *City of Westland Police & Fire Retirement System v. Axcelis Technologies, Inc.*, 1 A.3d 281, 287-88 (Del. 2010) (quoting *Seinfeld*, 909 A.2d at 123).

ITT describes the Staff Report as hearsay in the context of this proceeding. In particular, ITT views this report as unreliable because it was written by staff members of the Senate Majority Committee, and the Senate minority staff had been highly critical of the process leading to and the findings contained in the majority staff's report. In addition, ITT argues that the majority staff took Fitzpatrick's comment out of context. According to ITT, Fitzpatrick's comment had been made during a conference call in early 2010, right after the new three-year measurement period for CDRs had been adopted, and before ITT had any three-year CDRs. Moreover, ITT argues that its own concerns of having three-year CDRs higher than 30 percent should not be deemed to imply mismanagement considering the recent economic recession and its obvious adverse effect on the ability of students to repay their student loans. Finally, ITT points to its official three-year CDRs for FFY 2010,[19] showing that ITT had not exceeded the 30 percent threshold in FFY 2010 and, therefore, was not at risk of being placed on provisional certification or losing its eligibility to participate in Title IV programs.

---

[19] In September 2013, the Department of Education issued FFY 2010 three-year CDRs for ITT Technical Institute in Indianapolis, IN (29.2%), ITT Technical Institute in Spokane Valley, WA (26.8%), and Daniel Webster College, Nashua, NH (10.7%). *See* Transmittal Affidavit of Christopher N. Kelly to Opening Brief in Support of Defendant's Cross-Motion for Summary Judgment and Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment, Exs. 4-6. The average of ITT's institutions' three-year CDRs for FFY 2009 was 32.9%, having been reduced by the Department of Education from 34.2% as a result of an uncorrected data adjustment, according to ITT's quarterly report for the first quarter of 2013. *See* Transmittal Affidavit of Christopher N. Kelly, Ex. 7 at p. 31.

Hearsay statements may be considered to determine whether there is a credible basis to infer that mismanagement has occurred, provided they are sufficiently reliable.[20] In this case, there is no dispute that the Staff Report accurately quoted the response of the ITT CFO to an investor's question during the conference call, even if the quotation did not include Fitzpatrick's entire response.[21] Thus, the quotation is admissible as reliable hearsay. Apparently, what

---

[20] *See Paul v. China MediaExpress Holdings, Inc.*, 2013 WL 28818, at \*5 (Del. Ch. Jan. 5, 2012); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at \*4 (Del. Ch. April 28, 2004) (citing *Thomas & Betts Corp. v. Leviton Manufacturing Co., Inc.*, 681 A.2d 1026, 1032-33 (Del. 1966)).

[21] Affidavit of Daniel M. Fitzpatrick, at ¶¶ 16-17 (emphasis added):

> During the fourth quarter 2009 earnings conference call with investors, which took place on January 21, 2010, Andrew Fones, an analyst with UBS, asked the following question:
>
> > Yes, thanks. I had a questions [sic] on CDR's as well. I guess we got the three year cohort default – draft default rate data from the Department of Education recently. I was wondering if you could comment at all as to the – typically we'll see draft rates come down when we get the final official rates. Have you got any sense as to what the relative inflation was in those default rates, at the draft level at three years relative to what the official rates could end up being?
>
> In response to the above question, I stated:
>
> > Yes, probably cannot give you a lot of clarity on that. But ***I think that you do know that when we talk about adding that third year into the calculation, really that third year was not really worked at all, in the way that the first two years are worked and so it is really hard to indicate what type of an impact we can have there. We know that when we provide default management services there, we are able to mitigate losses.*** So there is a downward – trajectory, I mean that's likely. So to what degree, that's hard to say. Further, were there any appeals on those amounts and those defaults added? No, we did not look at those. When you look at

ITT finds most objectionable is the conclusion reached by the Senate majority committee staff, i.e., that ITT had only recently begun to focus its efforts on bringing down the three-year default rate. The majority committee staff was in a unique position to reach this conclusion, having investigated 29 other for-profit education companies as well. Although the Senate minority committee staff was concerned that the investigation had been "developed, in part, by relying on input of an investor with a financial interests in the demise of the for-profit [education] sector,"[22] there is no evidence that any majority committee staff had a significant financial interest in the demise of the for-profit education sector. For these reasons, I find the Staff Report to be sufficiently reliable to be considered in determining whether a credible basis exists to conclude that waste or mismanagement had occurred within ITT.

ITT had known at least since August 2008 when the HEA was amended that the Department of Education would be monitoring student loan default rates on a

appeals we can see anywhere from a moment or any – anywhere from a point or two reduction on a two year rate. Does that apply when you talk about the third year, I honestly don't know because we haven't delved into it, and we haven't been able to appeal yet. So I think through additional services, through appeals, there's – there's opportunities for us to move it. There are some other things that we're doing. We feel confident that ultimately when the three year rates come out, we'll manage those more in line with expectations and standards that are set.

[22] Opening Brief in Support of Defendant's Cross Motion for Summary Judgment, at p. 17 (citing Staff Report at pp. 178-81).

three-year basis starting with the 2009 cohort. ITT's average preliminary three-year CDR for FFY 2009 was 34.2 percent, well over the 30 percent threshold that could potentially result in ITT losing its eligibility to receive Title IV funding. The Staff Report of the Senate HELP Committee issued on July 29, 2012, found that ITT, which had the sixth highest default rate of the 30 companies studied, had only recently focused its efforts on bringing down its three-year default rate. A logical inference to be drawn from this credible evidence is that ITT failed to adequately plan and prepare for the new federal regulatory scheme. In other words, mismanagement may have occurred.

ITT, nevertheless, argues that its higher default rates were the result of problems with debt servicers during this time period, in addition to the severe economic recession that had an impact on the ability of ITT's students to repay their student loans. ITT further argues that Walther's concerns have proven unfounded since ITT's eligibility to participate in Title IV programs is not at risk, given its recently-released official 2010 three-year CDRs. However, these arguments are attempts to present a merits defense, which is disfavored in a Section 220 action.[23] Once a stockholder has presented sufficient evidence to

---

[23] *Caspian Select Credit Master Fund Ltd.,* 2014 WL 686308, at *4 (Del. Ch.) (citing *Norman v. U.S. MobilComm., Inc.,* 2006 WL 1229115, at *5 (Del. Ch. Apr. 28, 2006)).

demonstrate a credible basis, the stockholder does not need to prove actual wrongdoing in order to obtain certain books and records under 8 *Del. C.* § 220.

Having concluded that Walther has demonstrated a proper purpose, i.e., to investigate possible waste, mismanagement and breaches of fiduciary duty, I do not need to address Walther's remaining stated purposes. However, since ITT has challenged the scope of the requested books and records as overbroad, I must determine whether they are reasonably required to satisfy the purpose of Walther's demand.[24]

The five categories of books and records requested by Walther are limited to the time period from January 1, 2008 through October 9, 2012, a period which begins the year the HEA was amended and the first three-year cohort started repayment and ends the day before Walther filed his complaint. Walther has requested to inspect all Board or committee meeting minutes concerning: (1) ITT's processes for compliance with Title IV CDR eligibility requirements; (2) the underwriting issues related to ITT's CDRs; (3) the appeals made to the Department of Education regarding student CDRs; (4) ITT's projections of student CDRs for 2010, 2011, and 2012; and (5) steps ITT has taken to avoid penalties under Title IV related to excessive CDRs. With the exception of category (2), Walther should be

---

[24] *See Freund v. Lucent Technologies, Inc.,* 2003 WL 139766, at *4 (Del. Ch. Jan. 9, 2003).

allowed to inspect these documents because they are narrowly tailored and necessary and essential to investigate whether there has been waste, mismanagement or breaches of fiduciary duty in complying with Title IV eligibility requirements.[25]  Regarding category (2), ITT argues that Walther's request is baseless and illogical because ITT does not underwrite federal student loans.  Walther has not responded to this argument and, therefore, may be deemed to have waived this request, which in any event does not appear reasonably related to his purpose.  Therefore, I conclude that Walther's request for documents should be allowed as to categories (1), (3), (4) and (5), and denied as to category (2).

### Conclusion

For the reasons stated above, I recommend that Walther's motion for summary judgment should be granted as to Demand Numbers 1, 3-5, and denied as to Demand Number 2 and, conversely, that ITT's cross-motion for summary judgment be denied as to Demand Numbers 1, 3-5 and granted as to Demand Number 2.

ITT has taken several exceptions to my draft report.  First, ITT contends that I erred in disregarding evidence the company had submitted to explain the cause of its elevated three-year CDR for 2009 as an improper merits defense.  Second, ITT

---

[25] *See Robotti & Co., LLC v. Gulfport Energy Corp.,* 2007 WL 2019796, at *4 (Del. Ch. July 3, 2007).

contends that I erred in relying on the Staff Report's interpretation of an excerpted statement by ITT executive Daniel Fitzpatrick while ignoring Fitzpatrick's affidavit explaining what he meant by that statement. Third, ITT contends that I contravened the standard for deciding cross-motions for summary judgment by crediting the Staff Report and disregarding the earnings call transcript and Fitzpatrick's own uncontroverted affidavit. Finally, ITT contends that I erred in concluding that Walther has demonstrated a proper purpose for his demand to investigate possible waste, mismanagement, and breaches of fiduciary by the company's management when there is no evidence of any resulting damage to ITT. For the reasons that follow, I am modifying my draft report and now recommending in my final report that the Court grant summary judgment in favor of ITT and dismiss Walther's Section 220 action because it lacks a proper purpose.

First Exception:

In its cross-motion for summary judgment, ITT argued that its elevated student loan cohort default rates were the result of problems with debt servicers during the relevant time period, as well as the economic recession and high unemployment rates that had an adverse impact on the ability of ITT's students to repay their student loans. ITT also argued that its recently-released official 2010

three-year CDRs, all of which were under 30 percent,[26] demonstrate that Walther's concerns of mismanagement were unfounded.  In my draft report, I described these arguments as attempts to present a merits defense, which is disfavored in a Section 220 action.  ITT now contends that it was not engaged in a merits defense because these facts were not offered to prove that mismanagement had not occurred, but instead to refute Walther's claim that mismanagement was an inference that reasonably could be drawn from ITT's final average 2009 three-year CDR of 32.9 percent.  According to ITT, the loan servicing issues and recession demonstrate that the **only** reasonable inference to be drawn from its elevated 2009 three-year CDR was that it was caused by influences outside of ITT's control, not mismanagement.

Walther responds by arguing that ITT is merely making the same attempt to counter the inference of mismanagement by engaging in a merits defense. Moreover, according to Walther, ITT has failed to explain why it was not possible

---

[26] The Department of Education treats ITT as having three separate institutions and calculates a cohort default rate for each institution.  *See* Defendant's Reply Brief in Further Support of Defendant's Exceptions to the Master's Draft Report, Ex. A. The Indianapolis, Indiana campus of ITT Technical Institute, which is where the bulk of the operations of ITT Technical Institute take place, had the most elevated CDR in FFY 2010 (29.2%) while the other two smaller campuses, ITT Technical Institute in Spokane Valley, Washington and Daniel Webster College in Nashua, New Hampshire, had three-year cohort default rates of 26.8 % and 10.7 % respectively in FFY 2010.  Transmittal Affidavit of Christopher N. Kelly, Exs. 4-6.

that an economic recession and loan servicing issues could not also occur at the same time as mismanagement.

Before a shareholder may engage in a Section 220 books and record inspection, there must be a showing of possible mismanagement, waste or wrongdoing that would warrant further investigation into the matter.[27] A shareholder must make "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[28] ITT has taken exception to my failure to consider factors outside of the company's control, i.e., the loan servicing issues and economic recession, as the cause of its elevated three-year CDR for 2009. However, even if I had considered those factors in my draft report, they would not have altered my conclusion that Walther presented sufficient credible evidence for me to draw the reasonable inference that ITT had failed to prepare for the new federal regulatory scheme in a timely fashion.

The debt servicing issues as described in ITT's opening brief in support of its cross-motion for summary judgment stemmed from a 2009 decision by the Department of Education to redistribute federally-backed student loans to four

---

[27] *Louisiana Municipal Police Employees' Retirement System v. Lennar Corp.*, 2012 WL 4760881, at *3 (Del. Ch. Oct. 5, 2012).
[28] *Security First Corp. v. U.S. Die Casting and Development Co.*, 687 A.2d 563, 568 (Del. 1997).

different student loan management servicers, one of which was Sallie Mae.[29] According to ITT, the ensuing disruption and, in particular, Sallie Mae's problems with its servicing of federal student loans, led to increased defaults on such loans.[30]

The servicing issues that allegedly caused the increases in ITT's three-year CDRs for 2009 and 2010 should have had the same impact on every educational institution whose students had obtained federal education loans, not just ITT. The economic recession and high unemployment rates should have similarly affected students in other U.S. educational institutions, especially in the for-profit colleges, whose students are generally described as "non-traditional students – those who either delayed college, attend part-time or work-full-time while enrolled, are independent of their parents, or have dependents other than a spouse."[31]  Yet the July 30, 2012 Staff Report observed that among the 30 for-profit educational companies investigated, ITT had the sixth highest student default rate in the illustrative three-year CDR for the 2008 cohort,[32] suggesting that some other factor must have been at work to account for ITT's higher than average default rate.

---

[29] Opening Brief in Support of Defendant's Cross-Motion for Summary Judgment and Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment, at 5-7.

[30] *Id.*

[31] Plaintiff's Answering Brief in Opposition to Defendant's Exceptions to the Master's Draft Report, Ex. 1 at 1.

[32] The Department of Education started publishing official three-year rates in 2009. Plaintiff's Answering Brief in Opposition to Defendant's Exceptions to the

After studying ITT's cohort default rates and other evidence from the company, the Staff Report concluded that ITT had only recently begun to focus its efforts on bringing down the three-year cohort default rate.[33] This conclusion supplied another possible reason for ITT's elevated 2009 three-year CDR; in addition to the poor economy and loan serving problems, ITT was tardy in preparing for the new federal regulatory scheme.[34] I therefore drew from the Staff

Master's Draft Report, Ex. 1 at 151. Previously, it issued illustrative or trial three-year rates. *See id.* at n. 699.

[33] Affidavit of Matthew M. Houston in Support of Plaintiff's Motion for Summary Judgment, Ex. 5 at 532-534.

[34] According to the Staff Report, the new regulatory scheme was intended to address student loan default rate manipulation, as opposed to default rate management:

> Because continued financial aid eligibility hinges on default rates, schools that have high rates of students defaulting attempt to lower their rates through a variety of means known as "default management." Default management is not intrinsically negative. It may involve a multitude of strategies premised on sound goals, such as enrolling students who are likely to graduate and succeed, giving those students the support and tools they need to learn and secure a degree that is valued in the job market-place, helping them secure a well-paying job, and offering financial literacy classes and quality debt counseling. ….
>
> While assisting with students' debt repayment can be helpful to students, the committee's investigation has revealed that many for-profit schools are deploying tactics to delay student loan defaults, not to protect the student, but rather to protect the college so that they do not lose access to Federal taxpayer-funded student aid dollars – the lifeblood of the for-profit model. Many for-profit schools have chosen instead to commit significant resources to sophisticated operations that keep students out of default for the duration of the 2-year (and now 3-year) monitoring window by aggressively signing students up for forbearance and deferment to temporarily delay loan payments. This practice is troubling for taxpayers. The cohort default rate is designed not just as a sanction but also as a key indicator of a school's

Report's conclusion the reasonable inference that possible corporate mismanagement may have contributed to the elevated 2009 three-year CDR. Thus, whether I disregard the loan servicing issues and economic recession as an improper merits defense or consider them in determining whether Walther has made a credible showing of legitimate issues of wrongdoing, the end result is the same. This first exception should be dismissed.

Second Exception:

ITT challenges my reliance on the Staff Report, in particular, its conclusion that ITT had only recently begun to focus its efforts on bringing down the three-year default rate. According to ITT, I erred in accepting the Staff Report's interpretation of Daniel Fitzpatrick's statements during the January 21, 2010 earnings call instead of considering and interpreting Fitzpatrick's affidavit myself. ITT argues that the Staff Report took selected comments by Fitzpatrick out of context because he was not discussing why the three-year default rate was higher than the two-year default rate. Instead, ITT claims that Fitzpatrick was merely responding to an inquiry during the earnings call whether and to what extent the trial three-year CDRs were inflated relative to an official three-year CDR. In

ability to serve its students and help them secure jobs. If schools actively work to place students in forbearance and deferment, this means taxpayers and policymakers fail to get an accurate assessment of default rates. Plaintiff's Answering Brief in Opposition to Defendant's Exceptions to Master's Draft Report, Ex. 1 at 151.

addition, ITT argues that I failed to consider the entire earnings call transcript, in which Kevin Modany, ITT's CEO, explained that ITT was actively taking steps to manage its CDRs. Finally, ITT argues that the Staff Report itself was hearsay and no Delaware case upholds a Section 220 demand based solely on hearsay evidence.

In anticipation of the change from a default rate monitoring window of two years to three years that was to occur in 2014,[35] the Department of Education reported trial three-year CDRs for the years 2005 through 2008, and released these rates to the companies, who were allowed to make corrections and corrected rates were issued.[36] During the January 21, 2010 earnings call, Fitzpatrick was asked the following question:

> I had a question[] on CDR's as well. I guess we got the three year cohort default – draft default rate data from the Department of Education recently. I was wondering if you could comment at all as to the - typically we'll see draft rates come down when we get the official rates. Have you got any sense as to what the relative inflation was in those default rates, at the draft level at three years relative to what the official rates could end up being?[37]

---

[35] Starting with the 2014 cohort, a school may lose eligibility for federal loans if its three-year CDR is greater than 40 percent in a single year, or is greater than 30 percent for each of the three most recent years. *Id.* at 151, n. 698.

[36] Appendix 16 of the Staff Report contains trial three-year CDRs for 2005 through 2008 for each of the 30 companies, including ITT, whose default rate for 2008 was 26.3 percent. *Id.* at A16-1-4.

[37] Affidavit of Daniel M. Fitzpatrick, at ¶ 16-17.

Fitzpatrick's response was as follows:

> Yes, probably cannot give you a lot of clarity on that. But I think that you do know that when we talk about adding that third year into the calculation, really that third year was not really worked at all, in the way the first two years are worked and so it is really hard to indicate what type of impact we can have there. We know that when we provide default management services there, we are able to mitigate losses. So there is a downward – trajectory, I mean that's likely. So to what degree, that's hard to say. Further, were there any appeals on those amounts and those defaults added? No, we did not look at those. When you look at appeals we can see anywhere from a moment or any – anywhere from a point or two reduction on a two year rate. Does that apply when you talk about the third year, I honestly don't know because we haven't delved into it, and we haven't been able to appeal yet. So I think through additional services, through appeals, there's – there's opportunities for us to move it. There are some other things that we're doing. We feel confident that ultimately when the three year rates come out, we'll manage those more in line with expectations and standards that are set.[38]

The Staff Report, however, included only the following excerpt of Fitzpatrick's response in order to support its now-controversial conclusion:

> ITT has only recently begun to focus these efforts on bringing down their 3-year default rate. When discussing as to why the 3-year default rate was higher than the 2-year, ITT CFO Daniel Fitzpatrick stated:

---

[38] *Id.*

I think that you do know that when we talk about adding that third year into the calculation, really that third year was not really worked at all, in the way the first two years are worked and so it is really hard to indicate what type of impact we can have there. We know that when we provided the default management services there, we are able to mitigate losses.[39]

ITT again complains that Fitzpatrick's statement was taken out of context, and that he was not addressing ITT's efforts to bring down its three-year CDRs, as evidenced by Fitzpatrick's affidavit. According to ITT, "Fitzpatrick was merely observing that the guaranty agencies had not focused on students in the third year of their loans because, historically, the Department of Education always had measured only two-year CDRs."[40]

The fact that Fitzpatrick's affidavit was uncontraverted is irrelevant because the affidavit is, in effect, an attempt to rescript the earnings call. If Fitzpatrick's comments during the earnings call reasonably support the inference drawn by the authors of the Staff Report, then Fitzpatrick's subsequent explication does not undermine the Staff Report's reliability. What is telling about Fitzpatrick's response in its entirety is that Fitzpatrick was unable to explain the impact default management services might have on ITT's three-year default rates, despite ITT

---

[39] Affidavit of Matthew M. Houston, Ex. 5 at 532-534.
[40] Defendant's Opening Brief in Support of Defendant's Exceptions to Master's Draft Report, at 16.

having known at least since August 2008 that the Department of Education would be monitoring student loan default rates on a three-year basis starting with the 2009 cohort. During the earnings call on January 21, 2010, Fitzpatrick merely predicted that with some additional unspecified services and appeals, ITT would be able to reduce the three-year cohort default rate by a point or two.

Fitzpatrick's response is also consistent with Modany's earlier comments regarding ITT's default management goals during the same earnings call:

> I will say though, and it gives us an opportunity to speak to a – a little bit to the fact that we are absolutely enhancing default management services, doing things both internally, and potentially externally. Those costs also are reflected in the 2010 internal goals to the extent that someone would ask that question as a follow-on. But we are absolutely doing what we need to do there. And we mentioned in October, that there's a lot we can do there, that we believe we can have a positive impact there, and we need to do some of that stuff. There are a lot of things going on in terms of self-loans going to DL, what that means from a servicing perspective. And, so default management is a very important part of what we'll be doing and focusing on in 2010.[41]

Like Fitzpatrick, Modany expressed himself in non-specific, general terms, i.e., "doing things both internally, and potentially externally," "there's a lot we can do there," "we need to do some of that stuff." However, he was explicit about one thing: ITT was going to be engaged in and focusing on default management

---

[41] Transmittal affidavit of Christopher N. Kelly, Ex 8 at 9.

starting in 2010. A reasonable inference to be drawn from Fitzpatrick's vague comments about ITT's student loan default rate management and Modany's announcement of ITT's goals for 2010 is that as of January 2010, ITT had not yet developed strategies for bringing down its three-year cohort default rates. The Staff Report examined the student loan default rate management strategies of 30 for-profit education companies, including ITT.[42] Thus, the authors of the Staff Report would have been in a unique position to know when ITT began to focus its efforts on bringing down its three-year default rate and ITT's progress in this regard relative to the other 29 companies.

ITT also argues that I failed to consider Fitzpatrick's statement made during the conference call that he was "confident" ITT would manage the new three-year CDRs as evidence that clearly contradicted the conclusion of the Staff Report. The subsequent record, however, shows that Fitzpatrick's confidence was misplaced and the Staff Report's conclusion was justified since ITT failed to "manage" its first official 2009 three-year CDR, which exceeded the 30% threshold.

ITT argues that the Staff Report was the result of a highly politicized process and suffered from serious deficiencies. ITT also describes the Staff Report as

---

[42] Plaintiff's Answering Brief in Opposition to Defendant's Exceptions to the Master's Draft Report, Ex. A at 155 n. 720 ("ITT Internal Record, August 2010, Cohort Default Management Solutions Executive Dashboard: Table of Key Performance Indicators (ITT-0002316)").

hearsay lacking any indicia of reliability and trustworthiness such as might be found in live, in-court testimony or where events occurring after publication of a report reinforce a plaintiff's claims. Accordingly, ITT argues that I should have disregarded the Staff Report entirely and, without it, Walther's only purported evidence of mismanagement would be ITT's elevated 2009 three-year CDR and a cautionary statement that its preliminary 2010 three-year CDR could exceed the 30% threshold, which would not support an inference of mismanagement.

The Staff Report was the product of a two-year "in-depth oversight investigation" conducted between June 2010 and July 2012 by the United States Senate Committee on Health, Education, Labor and Pensions.[43] The investigation focused on the for-profit sector of higher education. The main body of the Staff Report runs 181 pages, including the Minority Committee Staff Views printed on the last four pages. The minority accused the majority of not seeking bipartisan input and support because the majority refused to expand the scope of the investigation to include all institutions of higher education that serve the other 90 percent of postsecondary students, and because they did not hold bipartisan hearings on the Department of Education's program integrity regulations. The minority specifically complained that: (1) the investigation was developed, in part, by relying upon the input of an investor who had a conflict of interest because he

---

[43] *Id.,* Ex. 1 at Preliminary Page.

had a financial interest in the demise of the for-profit sector; (2) the findings of the investigation include discredited Government Accountability Office (GAO) testimony; (3) majority committee staff directly participated in the drafting of witness testimony; (4) the majority mischaracterized facts and cited documents out of context to suggest improper motivations or embarrass institutions and their management; and (5) the majority repeatedly refused to examine similar problems at public and private non-profit institutions of higher education.[44]

The complaint about the majority citing documents out of context pertained to a single document on which the majority relied twice, despite having been warned by the minority to confirm the document's accuracy and context. Nevertheless, ITT argues that such similar improper behavior occurred here when the majority cited Fitzpatrick's two-year old earnings statement out of context to support an assertion that, according to ITT, the statement did not address. There is, however, nothing in the record to suggest that the Staff Report's conclusion was politically motivated or designed to embarrass ITT or its management. References to ITT throughout the Staff Report are, more often than not, positive relative to the other for-profit companies.[45] Even in one situation where ITT was described in a

---

[44] *Id.,* Ex 1 at 179-181.

[45] For example, in comparing withdrawal rates for the ten highest recipients of Post-9/11 GI Bill Funds, ITT was shown to have the second lowest withdrawal rates of the eight for-profit companies included on the list (*Id.,* Ex. 1 at 29); in

negative fashion, the tone of the Staff Report was moderate. This occurred in a discussion of manipulative student recruiting techniques, where the Staff Report described ITT's pain-based sales techniques in considerable detail and referred to ITT as going "a step further than most other companies in their pain-based sales techniques with a 'Pain Funnel[.]'"[46] Furthermore, the Staff Report repeatedly acknowledged ITT's claim that the pain-based training documents were unauthorized and had been used for only a short time at a single campus.[47]

There is no evidence that the majority committee staff were politically motivated to discredit or embarrass ITT. Moreover, ITT has ignored the credit it was given in at least one aspect of for-profit education, i.e., the area of lower demand careers. Concerned that for-profit colleges did "not base programming on workforce needs, so much as they base programming on revenue potential," the Staff Report gave, as an example, criminal justice programs that "offer few clear paths to quality employment opportunities," and cited the CEO of ITT as having noted "in a recent call with investors, the company [had] placed enrollment caps on

---

comparing the withdrawal rates of five for-profit education companies with the highest associate degree tuition for students enrolling in 2008-9, ITT was shown to have the lowest percentage of students withdrawing among these companies (*Id.,* Ex. 1 at 79); in comparing spending per student on marketing and instruction at the five most profitable for-profit education companies in 2009, ITT had the highest spending per student on both marketing and instruction of the five companies (*Id.,* Ex. 1 at 87).

[46] *Id.,* Ex. 1 at 60-62.

[47] *Id.,* Ex. 1 at 60 n. 89-190; *Id.*, Ex. 1 at 61 n. 194-195.

some criminal justice programs because they were not generating good student outcomes, meaning retention, completion and job placement."[48]  In light of this record, there is no support for ITT's argument that the Staff Report mischaracterized the January 21, 2010 earnings call statement about default management in order to embarrass ITT.

Regarding ITT's contention that the Staff Report is inadmissible hearsay, ITT does not dispute that there was other evidence regarding ITT's default management strategies that was available to the majority committee staff.[49]  The staff knew that ITT's most recent three-year CDR (2008) was the sixth highest default rate among the 30 schools, and that ITT expected its 2009 draft three-year CDR to be approximately 34 percent, which turned out to be the case.  Even though it was only an excerpt of Fitzpatrick's statement that was highlighted in the report published two and a half years after the earnings call had taken place, it is a verbatim excerpt that is tenable contextually when the earnings call transcript is read in its entirely.  Nor is it temporally illogical to conclude from the earnings call and other evidence that ITT had "only recently begun to focus these [default management] efforts on bringing down their 3-year default rate[]" before the

---

[48] *Id.,* Ex. 1 at 121 & n. 509.
[49] *See id.*, Ex. 1 at 155 n. 720 ("ITT Internal Record, August 2010, Cohort Default Management Solutions Executive Dashboard: Table of Key Performance Indicators (ITT-00002316)").

Department of Education released its first official three-year CDRs in September 2012 when ITT itself acknowledged in its Form 10-Q form for the first quarter of 2012, that its preliminary average three-year CDR for 2009 was 34.2 percent and ITT anticipated exceeding the 30 percent threshold for its three-year 2010 CDR.[50] Therefore, I see no reason to alter my conclusion that the Staff Report is sufficiently reliable to be considered in this Section 220 action. I recommend that this exception be dismissed.

Third Exception:

ITT argues that I drew unreasonable inferences in Walther's favor relating to the 2009 three-year CDR, the Staff Report, and the Fitzpatrick Affidavit. ITT considers them unreasonable because, as discussed above, ITT believes that the only reasonable inference that could be drawn from the elevated three-year CDR for the 2009 cohort, is that it was an anomaly caused by outside influences beyond ITT's control. Regarding the Staff Report, ITT argues that its unreliability is reinforced by the minority committee staff's concerns that I failed to mention in my draft report. Finally, ITT argues that I failed to consider in my draft report evidence directly contradicting the inference I drew from the Staff Report that "ITT failed to adequately plan and prepare for the new federal regulatory scheme,"

---

[50] Affidavit of Matthew M. Houston in Support of Plaintiff's Motion for Summary Judgment, Ex. 5 at 28.

i.e., the earnings call transcript and the Fitzpatrick Affidavit. As a result, ITT now presumes that I made an inappropriate determination, on a summary judgment record, that Mr. Fitzpatrick's testimony was not credible.

I believe that I have thoroughly addressed these arguments in my discussion of ITT's second exception above. Therefore, I will not repeat my discussion, and recommend that the third exception be dismissed.

Fourth Exception:

In my draft report, I summarily concluded that Walther had demonstrated a proper purpose for bringing a Section 220 action, i.e., to investigate possible waste, mismanagement and breaches of fiduciary duty in complying with Title IV eligibility requirements. In its fourth exception, ITT now argues that I erred in finding a proper purpose because Walther has not shown that he can bring a *Caremark* claim.[51] According to ITT, even if one assumes corporate mismanagement was the cause of ITT's elevated three-year default rate for the 2009 cohort, the alleged mismanagement has failed to result in any loss or injury to ITT because ITT is not at risk of losing its Title IV eligibility.[52] Citing *Louisiana*

---

[51] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[52] The official three-year CDRs for 2011 were recently released. ITT's official three-year CDR for 2011 was 22.4 percent. *See* Defendant's Reply Brief in Support of Defendant's Exceptions to the Master's Draft Report, Ex. A.

*Municipal Police Employees Retirement System v. Lennar Corporation*,[53] and *Graulich v. Dell Inc.*,[54] ITT now contends that Walther is seeking to investigate a wrong for which there is no remedy and, accordingly, has not demonstrated a proper purpose.

In response, Walther argues that the cases on which ITT relies have been taken out of context, and that he has standing to bring suit because he has alleged wrongdoing that affects his interest as stockholder. He argues that ITT could not possibly know what type of claim he may bring and, because he is seeking internal documents, he should be allowed to go forward with his 220 action and that it is premature to predict what type of claim he may bring. In addition, Walther argues that ITT is again raising an improper merits defense unavailable at this stage of the proceeding and implies that, in light of the precipitous decline of ITT's stock price since 2012, other damage to the company may have occurred that would likely involve expert testimony at a later stage.

ITT is not challenging Walther's standing to bring this action. However, it is evident from the record that Walther is seeking to inspect ITT's books and records to investigate a possible claim for breaches of fiduciary duty on the part of ITT's board of directors as a result of their failure to act in response to the

[53] *Louisiana Mun. Police Emps. Retirement System v. Lennar Corp.,* 2012 WL 4760881, at *2 (Del. Ch. Oct. 5, 2012).
[54] *Graulich v. Dell Inc.*, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011).

Department of Education's new three-year measurement period; in other words, Walther is seeking evidence with which to bring a *Caremark* claim. In his Section 220 Demand letter dated October 10, 2012, Walther stated the purpose of his demand as follows:

> To enable the Record Holder on behalf of the Company: (1) to investigate corporate mismanagement, waste or wrongdoing, including but not limited to, to determine whether the Company's officers and directors have properly discharged their fiduciary duties to the Company and its stockholders; (2) to obtain information to determine whether or not the Company's officers and directors are independent and disinterested, and whether they have acted in good faith; and (3) to value the stock held by the Record Holder. These purposes are reasonably related to the Record Holder's interest as a stockholder as a result of being identified in the Senate Report released July 29, 2012 and annexed hereto in part. The review of such information, moreover, will lead to a proper end for the reasons stated above.[55]

ITT rejected this demand by letter dated October 17, 2012, not only challenging Walther's status as a record holder, but also describing Walther's purported purposes for inspection as mere boilerplate and deficient. By letter dated November 14, 2012, counsel for Walther responded as follows:

> There can be no doubt that ITT's business model is dependent upon its continued eligibility to receive federal Title IV student loan funds. In 2011, ITT received more than 65% of its income from federal student loan funds paid pursuant to Title IV. When it is disclosed in governmental reports that ITT, in fact, has one of the

---

[55] Verified Complaint, Ex. B.

highest cohort default rates of any for-profit educator and that such default rates place ITT's income stream in jeopardy, **ITT stockholders has the right to know what was known by the ITT Board and what, if any, actions were taken by the ITT Board. Failure to act may constitute an actionable breach of the director's fiduciary duties.** Without production of the records concerning ITT's cohort default rates, Mr. Walther and other stockholders will be left without information that is readily available and would be of assistance in examining whether the Board is continuing to work for its shareholders.[56]

One of the required elements of a *Caremark* claim is loss or harm to the corporation.[57] The scope of Walther's demand was essentially limited to his concern that ITT was jeopardizing an important income stream, i.e., federal student loans, as a result of its excessive cohort default rates.[58] Given ITT's recently-released official three-year CDRs for 2010 and 2011, which are well below the 30% threshold,[59] ITT is not at risk of losing this income stream. ITT would have to exceed the 30% threshold for three consecutive years before it would lose its eligibility to participate in federal student loan programs. There is no probability,

---

[56] *Id.* at Ex. D (emphasis added) (footnote omitted).

[57] *See Canadian Commercial Workers Industry Pension Plan v. Alden*, 2006 WL 456786, at *6 (Del. Ch. Feb. 22, 2006).

[58] Although Walther also mentioned in passing that his purpose was to determine the value of his shares, ITT is a publicly traded company and Walther owns less than ten shares of the company's stock. Walther has presented no evidence suggesting that the publicly available information about ITT is insufficient to value his publicly traded shares. *See Marathon Partners L.P. v. M & F Worldwide Corp.*, 2004 WL 1728604, at *8 (Del. Ch. July 30, 2004).

[59] Defendant's Reply Brief in Further Support of Defendant's Exceptions to the Master's Draft Report, Ex. A.

at least in the near future, that such harm will occur.  While Walther now argues that there may have been other damage done to the company, such as harm to ITT's reputation, this is mere speculation on Walther's part.  To allow Walther to inspect ITT's books and records regarding ITT's cohort default rate management efforts would simply be an indulgence that could lead to mischief and "indiscriminate fishing expeditions."[60]  Since Walther is seeking use Section 220 to investigate alleged "corporate wrongdoing for which there is no remedy," Walther has not stated a proper purpose under 8 *Del. C.* § 220.[61]  Therefore, this exception should be upheld.

## Conclusion:

For the reasons stated above, I am modifying my draft report and now recommending that the Court deny Walther's motion for summary judgment in its entirety and grant ITT's cross-motion for summary judgment.  The parties are referred to Court of Chancery Rule 144 for the process of taking exceptions to a Master's Final Report.

Respectfully,

/s/ Kim E. Ayvazian

---

[60] *Seinfeld v. Verizon Communications, Inc.,* 909 A.2d 117, 123 (Del. 2006).
[61] *Louisiana Municipal Police Employees' Retirement System*, 2012 WL 4760881, at *2.

Kim E. Ayvazian
Master in Chancery